**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| WELLS FARGO BANK, N.A., as Trustee, TROPIC CDO I LTD., TROPIC CDO I CORP., TROPIC CDO II LTD., TROPIC CDO II CORP., TROPIC CDO III LTD., TROPIC CDO III CORP., TROPIC CDO IV LTD., TROPIC CDO IV CORP., SOLOSO CDO 2005-1 LTD., SOLOSO CDO 2005-1 CORP., SOLOSO CDO 2007-1 LTD., and SOLOSO CDO 2007-1 CORP., | : : : : : : : : : | |
| Interpleader Plaintiffs, | : : : | Case No. 1:09-cv-9135 (DC) |
| -against- | : : : | |
| TRUST PREFERRED SOLUTIONS, LLC; HILDENE OPPORTUNITIES MASTER FUND, LTD., CITIBANK, N.A., CITIGROUP GLOBAL MARKETS, INC., ZIONS FIRST NATIONAL BANK, VERTICAL CDO 2004-1, LTD., VERTICAL CDO 2003-1 LTD., BANC OF AMERICA SECURITIES LLC, ING CAPITAL LLC, AUGUSTUS FUNDING LTD., LIMEHOUSE CDO 2008-1 LTD., PENNWOOD CDO 2008-1 LTD., HSH NORDBANK AG LUXEMBOURG BRANCH, SHENANDOAH LIFE INSURANCE COMPANY, THE HUNTINGTON NATIONAL BANK, AG FINANCIAL PRODUCTS INC., SCP CAPITAL I, LTD., SCP MASTER FUND II, LTD., CRYSTAL FUND, LTD., CRYSTAL FUND II, LTD., WOODMEN OF THE WORLD LIFE INSURANCE, AG CNG FUND, L.P., AG SUPER FUND, L.P., AGA SUPER FUND INTERNATIONAL PARTNERS, L.P., ALVIN SHERMAN 1993 REV.LIVING TRUST, GAM ARBITRAGE INVESTMENTS, INC., JAYNE SHERMAN, WATERFALL EDEN MASTER FUND, LTD., WMS WASHINGTON FUND LLC, and CEDE & CO., as holder of certain Secured Notes and nominee name of the Depository Trust Company, and DOES 1 through 100, owners of beneficial interests in the Notes and/or Preferred Shares, | : : : : : : : : : : : : : : : : : : : : : : : : : : : : : | **MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT TRUST PREFERRED SOLUTIONS LLC'S MOTION FOR JUDGMENT ON THE PLEADINGS AND TO DISMISS CERTAIN CROSS-AND COUNTER-CLAIMS** |
| Interpleader Defendants. | : : : : : | |

# TABLE OF CONTENTS

**Page(s)**

Preliminary Statement .................................................................................................. 1

Background .................................................................................................................... 3

Argument ...................................................................................................................... 9

I.     This Court Can Interpret the Indenture Language as a Matter of Law ............................. 9

II.    The Preferred Shareholders Have Directed the Trustee to Accept the TPS Offer ........... 11

     A.    The Pleadings and the Plain Terms of the Indenture Establish that the Preferred Shareholders Have Directed the Trustee to Accept the TPS Offer ...................... 11

     B.    The Noteholders' Alternative Interpretation Has No Support in, and is Contradicted by, the Indenture .......................................................................... 14

          1.    Preferred Shareholders Have the Exclusive Right to Direct a Sale.......... 15

          2.    The Issuer is Precluded from Selling Portfolio Collateral ...................... 16

          3.    The Trustee May Not Sell Portfolio Collateral Absent an Event of Default .................................................................................................... 17

          4.    The Trustee and Issuer Have No Fiduciary Duties................................. 20

          5.    While the Offer is Fair, Its Fairness is Irrelevant ................................... 23

III.   The Noteholders' Cross- and Counter-Claims are Meritless .......................................... 25

     A.    Reformation ...................................................................................................... 25

     B.    Expiration of Offer ........................................................................................... 27

     C.    Fraudulent Conveyance ..................................................................................... 28

     D.    Tortious Interference with Contract .................................................................. 29

IV.   TPS's Consent Payments to the Preferred Shareholders are Fully Authorized................ 30

     A.    Implied Covenant ............................................................................................. 31

     B.    Proceeds............................................................................................................ 33

     C.    Collateral Interest/Principal Collections........................................................... 36

Conclusion ................................................................................................................ 39

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*AG Capital Funding Partners, L.P. v. State Street Bank and Trust Co.,*
    11 N.Y.3d 146 (2008) ................................................................................... 20, 21

*Am. Express Bank Ltd. v. Uniroyal, Inc.,*
    562 N.Y.S.2d 613 (N.Y. App. Div. 1990) ............................................................ 10

*AMEX Ass. Co. v. Caripides,*
    316 F.3d 154 (2d Cir. 2003) ................................................................................ 26

*Aon Financial Products v. Societe,*
    476 F. 3d 90 (2d Cir. 2007) ................................................................................. 10

*Aramony v. United Way of America,*
    254 F.3d 403 (2d Cir. 2001) ................................................................................ 37

*Argonaut Partnership L.P. v. Bankers Trustee Co. Ltd.*
    2001 WL 585519(S.D.N.Y. May 30,2001) ......................................................... 23

*Ashcroft v. Iqbal,*
    129 S.Ct. 1937 (2009) ......................................................................................... 28

*Brass v. Am. Film Techs., Inc.,*
    987 F.2d 142 (2d Cir. 1993) .................................................................................. 9

*Broad v. Rockwell,*
    642 F.2d 929 (5th Cir. 1981) ............................................................................... 31

*Burns Int'l Sec. Servs., Inc. v. Int'l Union, United Plant Guard Workers of Am.,*
    47 F.3d 14 (2d Cir. 1994) ...................................................................................... 9

*Chapman v. New York State Div. for Youth,*
    546 F. 3d 230 (2d Cir. 2008) .......................................................................... 10, 18

*Cleveland v. Caplaw Enter.,*
    448 F.3d 518 (2d Cir. 2006) .................................................................................. 9

*Elliott Assoc. v. Bio-Response, Inc.,*
    1989 WL 55070 (Del.Ch. May 23, 1989) ........................................................... 29

*Elliott Assoc. v. J. Henry Schroder Bank & Trust Co.,*
    838 F.2d 66 (2d Cir. 1988) ........................................................................20, 21, 23

*George Backer Management Corp. v. Acme Quilting Co.,*
46 N.Y.2d 211 (1978)................................................................. 26

*Hartford Fire Ins. Co. v. Federated Dep't Stores, Inc.,*
723 F. Supp. 976 (S.D.N.Y. 1989) ...............................................25, 31, 32

*Hartford Fire Ins. Co. v. Orient Overseas Containers Lines (UK) Ltd.,*
230 F.3d 549 (2d Cir.2000).......................................................... 18

*In re Enron Corp. Securities, Derivative & "ERISA" Litigation,*
2008 WL 744823 (S.D. Tex. 2008) .................................................. 29

*In re Gluth Bros. Const., Inc.,*
2009 WL 4037795 (Bkrtcy. N.D.Ill. November 19, 2009)......................... 28

*In re Kaplan,*
143 F.3d 807 (3d Cir. 1998) ......................................................... 33

*In re Solutia, Inc.,*
2007 WL 1302609 (Bkrtcy. S.D.N.Y., May 1 2007) ..............................25, 31, 32

*Kass v. Kass,*
91 N.Y.2d 554 (1998).................................................................. 10

*Katz v. Oak Industries Inc.,*
508 A.2d 873 (Del. Ch. 1986) ....................................................... 32

*Lama Holding Co. v. Smith Barney, Inc.,*
88 N.Y.2d 413 (1996).................................................................. 29

*LNC Investments v. First Fidelity Bank,*
173 F. 3d 454 (1999) .................................................................. 20

*McMahan & Co. v. Wherehouse Entertainment, Inc.,*
859 F. Supp. 743 (S.D.N.Y.1994).................................................... 29

*Metropolitan Life Ins. Co. v. RJR Nabisco, Inc.,*
716 F. Supp. 1504 (S.D.N.Y. 1989) ...............................................25, 31, 32

*Northeast Gen. Corp. v. Wellington Adv., Inc.,*
82 N.Y.2d 158 (1993)................................................................. 22, 23

*Revson v. Cinque & Cinque, P.C.,*
221 F.3d 59 (2d Cir. 2000)........................................................... 10

*SEC v. Credit Bancorp, Ltd.,*
168 F. Supp. 2d 122 (S.D.N.Y. 2001), *aff'd by* 290 F.3d 80 (2d Cir. 2002) ........... 17

*Sellers v. M.C. Floor Crafters Inc.*,
    842 F.2d 639 (2d Cir. 1988) ............................................................................... 9

*Sharon Steel Corp. v. Chase Manhattan Bank, N.A.,*
    691 F.2d 1039 (2d Cir. 1982) ................................................................... 9, 10, 11

*U.S. Bank Nat'l Ass'n v. U.S. Timberlands Klamath Falls, L.L.C.*,
    2004 WL 1699057 (Del.Ch. July 29, 2004) .................................................... 29

*Unigard Sec. Ins. Co., Inc. v. North River Ins. Co.*,
    4 F.3d 1049 (2d Cir. 1993) ............................................................................. 11

*VCG Spcl. Opportunities Master Fund v. Citibank*,
    594 F. Supp. 2d 334 (S.D.N.Y. 2008) ......................................................... 9, 10

*Victor v. Riklis*,
    No. 91 Civ. 2897, 1992 WL 122911 (S.D.N.Y. May 15, 1992) ............................ 29

*Wells Fargo Bank Minnesota, N.A. v. Nassau Broadcasting Partners, L.P.*,
    2003 WL 22339299 (S.D.N.Y. Oct. 10, 2003) .................................................... 23

## Statutes

N.Y. Debt. & Cred. Law § 273 ............................................................................ 28

## Rules

Fed. R. Civ. P. 8 .............................................................................................. 28

Rule 12 ........................................................................................................... 9

Interpleader Defendant Trust Preferred Solutions LLC ("TPS") submits this memorandum of law in support of its motion for judgment on the pleadings and its motion to dismiss the counter- and cross-claims.

### PRELIMINARY STATEMENT

In October 2009, TPS made an offer to purchase certain securities held as portfolio collateral by Tropic CDO IV Ltd. ("CDO IV" or "the CDO"). Section 10.3(d) of the Indenture[1] governing the CDO[2] provides that, absent an event of default, a valid offer to purchase portfolio collateral shall be accepted upon the direction of two-thirds of the preferred shareholders of the CDO. In addition to offering a purchase price for the securities ("the offer"), TPS tendered a fee payable to those preferred shareholders who accepted the offer. Pursuant to the indenture, Wells Fargo, as Trustee of the CDO ("the Trustee"), submitted TPS's offer to the preferred shareholders, and more than two-thirds issued a direction to the Trustee to sell the collateral to TPS. Before the Trustee could consummate the sale, however, certain noteholders of the CDO threatened legal action against the Trustee if it permitted the TPS transaction to proceed, prompting the Trustee to initiate this interpleader action.

The plain language of Section 10.3(d) of the Indenture authorizes the TPS transaction. The Trustee, which lacks any independent authority under the Indenture to approve or prohibit a sale of portfolio collateral in the absence of an event of default, informed the preferred shareholders that it was prepared to allow the transaction based solely on their direction. Nevertheless, certain noteholders now claim that the Trustee must abide by certain unspecified,

---

[1] The Indenture is attached as Exhibit 1 to the April 13, 2010 Declaration of Jacob W. Buchdahl in Support of TPS's Motion for Judgment on the Pleadings and to Dismiss Certain Cross- and Counter-Claims ("Buchdahl Decl."). An Appendix that contains relevant provisions of the Indenture is attached to the end of this Memorandum.

[2] A CDO or "collateralized debt obligation," is a type of structured asset-backed security whose value and payments are derived from a portfolio of fixed-income underlying assets.

and non-existent, "contractual and fiduciary" duties to the noteholders that purportedly prohibit the sale to TPS.  In a word, the noteholders complain that the TPS transaction would be "unfair."

There is nothing at all unfair or improper about the TPS offer or its acceptance by the preferred shareholders; the Indenture authorizes such an offer and requires the Trustee to accept it where, as here, the requisite number of preferred shareholders have given their direction to do so.  Nothing in the Indenture requires or even permits the Trustee to prevent this transaction. The arguments offered in this case by the nation's largest and most sophisticated financial institutions reflect an attempt to avoid the risks underlying CDO securities they purchased with what appears to be insufficient consideration of either the underlying documents or the potential consequences of a dramatic downturn in the underlying markets.    The only unfairness would be to allow their attempt to succeed.

The Trustee acted in accordance with the plain terms of the Indenture when it submitted the offer from TPS directly to the preferred shareholders.  The noteholders' objection to the Trustee's actions is based on a fanciful rewriting of the Indenture that has no support whatsoever in its text.  The noteholders contend that only the Issuer or Trustee is authorized to sell an item of portfolio collateral and that Section 10.3(d) merely gives preferred shareholders a "veto" power over their initial decision.  This claim is contradicted by the unambiguous terms of the Indenture, which explicitly forbids the Issuer and Trustee from selling portfolio collateral without direction from the preferred shareholders absent circumstances not present here, such as an event of default.  The noteholders also assert that the Trustee must override the procedures set forth in the Indenture and reject the TPS offer as "unfair" because the Trustee owes the noteholders a fiduciary duty to protect the Trust Estate.  But both the Indenture and black-letter New York law provide that an indenture trustee has no fiduciary duties other than to abide by the plain directives of the Indenture.  Moreover, no provision in the Indenture prohibits consent payments,

which are common in structured finance transactions.  The noteholders argue that the Indenture implicitly precludes such payments to the preferred shareholders (for exercising their contractual voting rights) because they are not "fair" to the noteholders.  The noteholders' resort to undefined principles of fairness is both telling and without merit.  The Indenture explicitly disavows implied terms, and courts in this district have consistently refused to read conjured prohibitions into indentures negotiated by sophisticated financial institutions.  If the parties to the Indenture wanted to prohibit consent payments, they could have done so.  Their failure to do so should not be remedied now by rewriting the contract's terms.

Because the Court can resolve this dispute by reference to the plain language of the Indenture, without resort to extrinsic evidence, a motion for judgment on the pleadings is warranted, and there is no reason to burden the parties or the Court with expensive and time-consuming discovery or further motion practice.  In a blatant, and baseless, attempt to muddy the waters, the noteholders also bring a horde of cross- and counter-claims, ranging from tortious interference with contract to fraudulent conveyance.  These claims, however, either overlap entirely with the main question of whether the Indenture authorizes the TPS transaction or are otherwise meritless.  TPS therefore respectfully moves this Court to declare, in accordance with the clear terms of the Indenture, that (a) the TPS transaction is authorized; (b) the Trustee is obligated to complete the sale; and (c) there is no prohibition against the preferred shareholders' collection of consent payments.  TPS further requests that the noteholders' cross- and counter-claims be dismissed with prejudice.

### BACKGROUND

Pursuant to an Indenture dated November 18, 2004 (the "Indenture"), Wells Fargo, as Trustee for the Tropic CDO IV Ltd., holds certain securities (the "portfolio collateral") and distributes proceeds received on those securities to holders of notes ("noteholders") and to

holders of preferred shares ("preferred shareholders") according to the terms of the Indenture.

On October 15, 2009, TPS delivered a letter to the Trustee offering to purchase certain items of portfolio collateral from six different CDOs, setting a deadline of October 29, 2009 for preferred shareholders to give their direction.  That same day, without taking any independent steps to evaluate the merits of the offer from TPS, the Trustee transmitted these offers directly to the preferred shareholders.  In its Notice of Offer and Request for Direction, the Trustee explained that, pursuant to Section 10.3(d) of the Indenture, if two-thirds of the preferred shareholders gave their direction to accept the offers by October 29, 2009, the Trustee would accept the terms of the TPS offer.  *See* Buchdahl Decl., Exh. 2, Tropic CDO IV Notice of Offer and Request for Direction ("Notice of Offer").[3]   On or before October 29, 2009, holders representing at least two-thirds of the preferred shares directed Wells Fargo to accept TPS's offer with respect to CDO IV.  Am. Compl. ¶ 58.  After extensions, the preferred shareholders rejected the other five TPS offers, *see id.* ¶¶ 59, 63, even though they were on substantially similar terms to the offer regarding CDO IV.[4]

The Trustee, in accordance with the plain terms of the Indenture, informed the preferred shareholders that its acceptance of the TPS offer was mandatory and conditioned solely upon receipt of the preferred shareholders' required direction.  *See* Buchdahl Decl., Exh. 2, Notice of Offer ("YOU [PREFERRED SHAREHOLDERS] MAY DIRECT THE TRUSTEE TO ACCEPT EACH TPS OFFER BY EXECUTING THE RELATED DIRECTION FORM"); *id.* ("Each TPS Offer will be accepted only if the direction to accept a TPS Offer . . . is obtained from the Requisite Majority [of preferred shareholders] on or before the Direction Expiration

---

[3] This document is incorporated by reference into the pleadings.

[4] As noted during the Scheduling Conference, *see* Mar. 5, 2010 Tr. 32:22-33:3, should the Court not dispose of the entire action in ruling on this motion, TPS reserves its right to move to dismiss the named parties that are not parties to CDO IV, for the reasons set forth in its February 25, 2010 letter.

Date."); Am. Compl. ¶ 61 (noting that Section 10.3 "appears to contemplate" that the Trustee must accept the offer pursuant to the direction of the preferred shareholders).  Despite that fact, the Trustee refrained from completing the sale due to objections and threatened litigation by certain noteholders.

Section 1.1 of the Indenture defines an "Offer" as follows:

> With respect to any security, (a) any offer by the issuer of such security <u>or by any other person</u> made to all of the holders of such class of security to purchase or otherwise acquire all such securities (other than pursuant to any redemption in accordance with the terms of the related Underlying Instruments) or to exchange such securities for any other security or other property or (b) any solicitation by the issuer of such security or any other Person to amend, modify or waive any provision of such security or any related Underlying Instrument.

Indenture ("Ind.") § 1.1 (emphasis added).  In its offer letter, TPS offered to purchase several securities from CDO IV for a total of $3.45 million.  *See* Buchdahl Decl. Exh. 2, Appendix to TPS Oct. 15, 2009 Letter, attached as Exh. A to Notice of Offer.  TPS made the offer on identical terms to any and all other holders of the securities.  *See* TPS Ans. Statement of Claim ¶ 5; Buchdahl Decl., Exh. 2, Notice of Offer (noting that Trustee relied on TPS's representation that the same offer was made on identical terms to the other holders).[5]

Two provisions in the Indenture govern the sale of portfolio collateral in response to an offer.  Section 10.3 of the Indenture, entitled "Custody and Release of Portfolio Collateral," provides in relevant part:

> (d) The Trustee on behalf of the Issuer shall notify the Holders of the Preferred Shares of any Portfolio Collateral that is subject to an Offer. If no Event of Default has occurred and is continuing and subject to the provisions of Article XII hereof, the Holders representing at least 66-2/3% of the Preferred Shares may direct the Trustee to release from the lien of this Indenture such Portfolio Collateral in accordance with the terms of the Offer in each case against receipt of payment therefor.

---

[5] The Indenture permits the Trustee to rely on any representation it believes to be genuine.  *See* Ind. 6.3(a)&(f).

5

Article XII of the Indenture, entitled "Sale of Portfolio Collateral," provides in relevant part:

> Holders representing at least 66-2/3% of the Preferred Shares may direct the Trustee to sell an item of Portfolio Collateral that is the subject of an Offer or call for redemption, if, together with its direction to sell such security, such Holders certify to the Trustee that the sales price for such Security is equal to or greater than the price available pursuant to such Offer or call . . . .

Ind. § 12.2.

No provision of the Indenture or any other operative document grants any party other than the preferred shareholders the right, power or obligation to direct the Trustee to accept or reject an offer to purchase portfolio collateral.  To the contrary, the Indenture explicitly prohibits both the Trustee and the Issuer from selling an item of portfolio collateral, "except as expressly permitted by this Indenture."  *Id.* § 7.8(a)(1) (Issuer); § 7.8(c) (Trustee).  Sections 10.3 and 12.2 are the only sections that relate to the sale of portfolio collateral in response to an offer.  Neither section "expressly permits" the Issuer or the Trustee to sell an item of portfolio collateral, except pursuant to the direction of the preferred shareholders.  Once the requisite percentage of preferred shareholders accepts an offer, moreover, the Trustee <u>must</u> follow that direction and consummate the transaction.

The Indenture also disavows any extra-contractual duties by the Trustee:

> The Trustee undertakes to perform such duties and <u>only such duties as are specifically set forth in this Indenture,</u> and no implied covenants or obligations shall be read into this Indenture against the Trustee.

Ind. § 6.1(a)(1) (emphasis added).  No provision of the Indenture "specifically sets forth" a duty for the Trustee to determine independently whether to accept an offer to purchase portfolio collateral.

In its October 15, 2009 Letter, TPS also stated that, in the event its offer were accepted, it would pay an amount in cash directly to those preferred shareholders who voted to accept the offer (the "consent payment").  *See* Buchdahl Decl. Exh. 2, TPS Oct. 15, 2009 Letter, attached as

Exh. A to Notice of Offer.  No provision of the Indenture, other operative document or legal principle prohibits consent payments.  Accordingly, the Trustee informed the preferred shareholders that if they gave their direction to accept the offer, the consent payment would be paid directly to them, without passing through the Trust Estate or the Trustee.  *See* Exh. 2, Trustee Notice of Offer.  The preferred shareholders also agreed, in the "Direction to Accept Offer" form that the Trustee transmitted to the preferred shareholders, that the effectiveness of their direction was not contingent on their receipt of consent payments:

> [T]he Consent Payment will <u>not be received by the Trustee</u> or the Issuer for distribution to the Holders of the Preferred Shares, the Holders of the Preferred Shares are solely responsible for the collection of the Consent Payment and the Issuer will sell the Security and the Trustee will release its lien on the Security <u>without regard to the receipt of the Consent Payment</u> by the Holders of the Preferred Shares.

Buchdahl Decl., Exh. 2, Tropic CDO IV Direction to Accept Offer, attached as Exh. B-1 to Notice of Offer (numbering omitted) (emphases added).

The Trustee was, and remains, ready and willing to sell the items of portfolio collateral to TPS pursuant to the direction of the preferred shareholders.  Notice of Offer; Am. Compl. ¶¶ 61, 64.  However, the Trustee stopped in its tracks when several parties – many of whom are not even stakeholders in this CDO – threatened to take legal action against Wells Fargo, the Issuer, TPS, and the preferred shareholders if the offers were accepted.  For example, interpleader defendant Hildene Opportunities Master Fund, Ltd. ("Hildene") wrote a letter to the Trustee candidly acknowledging that, under the express terms of the Indenture as written, the preferred shareholders have the power to "approve" the offer.  Hildene nonetheless argued that, in light of financial distress experienced by the CDO, fiduciary obligations "spring forth" – not just for the Trustee, but for the preferred shareholders <u>themselves</u> – that require the preferred shareholders to reject the offer:

When originated, the Preferred Shareholders were the most-likely to be impacted by a sale of any assets, so it was initially reasonable to confer on them the right to approve the sale by the Issuer of assets subject to an offer.

However, unprecedented distress of financial issuers has caused the Issuer's assets to experience unexpectedly high losses. . . .

As a result of the distress experienced by the Issuer, new fiduciary obligations spring forth as a matter of law for both the directors of the Issuer and for the equity holders of the Issuers, namely the Preferred Shareholders, to preserve the assets of the Issuers for the benefit of the creditors. . . .

If the Preferred Shareholders join with TPS in this action, the Federal Racketeering Influenced and Corrupt Organizations Act (RICO) permits civil actions by private parties for treble damages against each participant in the enterprise.  We urge the Trustee, Preferred Shareholders, each Issuer, the various directors and TPS to stop taking any further steps pursuant to the Offers.

Buchdahl Decl., Exh. 3, Hildene October 10, 2009 Letter (emphasis added).

In response to this and similar threats from other noteholders, the Trustee brought this interpleader action to resolve the dispute.  On October 30, 2009, upon learning of the Trustee's decision to bring this action, TPS wrote to the Trustee that it "welcome[d] such judicial guidance."  Buchdahl Decl., Exh. 4, TPS October 30, 2009 Letter.

There are two independent issues raised by this case.  The first is whether the Indenture requires the Trustee to adhere to the preferred shareholders' required direction and sell the portfolio collateral to TPS.   The second is whether the Indenture prohibits the preferred shareholders' receipt of consent payments from TPS.  TPS respectfully moves for judgment on the pleadings on both issues pursuant to Federal Rule of Civil Procedure 12(c).  The questions, however, are independent:   Because the directions of the preferred shareholders were not contingent on their receipt of the consent payments, the Court can decide whether the Trustee must accept the TPS offer without deciding whether the preferred shareholders are permitted to receive the consent payments.

The noteholders have also raised a cavalcade of cross- and counter-claims that rise or fall with the resolution of these two issues.  These remaining claims plainly fail to state a legally

cognizable claim for the reasons stated below. Accordingly, TPS respectfully moves for dismissal of every noteholder claim with prejudice.

ARGUMENT

## I.    This Court Can Interpret the Indenture Language as a Matter of Law

"Judgment on the pleadings is appropriate where material facts are undisputed and where a judgment on the merits is possible merely by considering the contents of the pleadings." *Burns Int'l Sec. Servs., Inc. v. Int'l Union, United Plant Guard Workers of Am.*, 47 F.3d 14, 16 (2d Cir. 1994); *Sellers v. M.C. Floor Crafters Inc.*, 842 F.2d 639, 642 (2d Cir. 1988). "The standard for addressing a Rule 12(c) motion for judgment on the pleadings is the same as that for a Rule 12(b)(6) motion to dismiss for failure to state a claim." *Cleveland v. Caplaw Enter.*, 448 F.3d 518, 521 (2d Cir. 2006). When analyzing a Rule 12(c) motion or Rule 12(b)(6) motion, the Court considers "the pleadings and exhibits attached thereto, statements or documents incorporated by reference in the pleadings, matters subject to judicial notice, and documents submitted by the moving party, so long as such documents either are in the possession of the party opposing the motion or were relied upon by that party in its pleadings." *VCG Spcl. Opportunities Master Fund v. Citibank*, 594 F. Supp. 2d 334, 339-40 (S.D.N.Y. 2008) (citing *Brass v. Am. Film Techs., Inc.,* 987 F.2d 142, 150 (2d Cir. 1993)). A court should dispose of the claims on the pleadings "if, from the pleadings, the moving party is entitled to judgment as a matter of law." *Id.* (quoting *Burns Int'l Sec. Servs., Inc. v. Int'l Union, United Plant Guard Workers of Am.,* 47 F.3d 14, 16 (2d Cir. 1995)).

"Interpretation of indenture provisions is a matter of basic contract law." *Sharon Steel Corp. v. Chase Manhattan Bank, N.A.,* 691 F.2d 1039, 1049 (2d Cir. 1982) (applying New York and federal law).[6] "The threshold question in a dispute over the meaning of a contract is whether

---

[6] Section 13.10 of the Indenture provides that the Indenture shall be governed by New York law.

the contract terms are ambiguous." *Revson v. Cinque & Cinque, P.C.*, 221 F.3d 59, 66 (2d Cir. 2000). "The interpretation of the unambiguous terms of a contract is . . . a matter of law." *Aon Financial Products v. Societe*, 476 F. 3d 90, 99 (2d Cir. 2007). "Under New York law, the question of ambiguity <u>vel non</u> must be determined from the face of the agreement, without reference to extrinsic evidence." *Revson*, 221 F.3d at 66. In deciding whether an agreement is ambiguous, "[p]articular words should be considered, not as if isolated from the context, but in the light of the obligation as a whole and the intention of the parties as manifested thereby. Form should not prevail over substance and a sensible meaning of words should be sought." *Kass v. Kass*, 91 N.Y.2d 554, 566 (1998). "A contract should be construed so as to give full meaning and effect to all of its provisions." *Chapman v. New York State Div. for Youth*, 546 F. 3d 230, 236 (2d Cir. 2008) (quoting *Am. Express Bank Ltd. v. Uniroyal, Inc.,* 562 N.Y.S.2d 613, 614 (N.Y. App. Div. 1990) (citations omitted)).

Because the interpretation of unambiguous contract terms is a matter of law, claims that turn on the interpretation of unambiguous contract terms may be disposed of on a judgment on the pleadings. *See, e.g.*, *VCG*, 594 F. Supp. 2d at 339-40 (granting judgment on pleadings for counterclaim in contract dispute). In the context of indentures, where "uniformity in interpretation is important to the efficiency of capital markets," and boilerplate provisions are "not the consequence of the relationship of particular borrowers and lenders and do not depend upon particularized intentions of the parties to an indenture," the meaning of "boilerplate provisions is . . . a matter of law rather than fact." *Sharon Steel*, 691 F.2d at 1048.

The operative terms of the CDO IV Indenture were used, without substantive variation, in five other indentures, *see* Am. Compl. ¶ 46, each of which has different issuers, noteholders, preferred shareholders and collateral holdings. Further, the terms were not the consequence of bargaining between the noteholders and preferred shareholders; the notes and preferred shares

were issued after the terms the Indentures were settled by the Trustee and the Issuers, the sole parties to the Indentures. Accordingly, under *Sharon Steel*, the meaning of the CDO IV provisions is a matter of law rather than fact. *See, e.g.*, *Unigard Sec. Ins. Co., Inc. v. North River Ins. Co.*, 4 F.3d 1049 (2d Cir. 1993) (courts should avoid "giving different meanings to identical standard contract provisions depending upon idiosyncratic factors in particular lawsuits"), citing *Sharon Steel*, 691 F.2d at 1048.

## II.   The Preferred Shareholders Have Directed the Trustee to Accept the TPS Offer

### A.   The Pleadings and the Plain Terms of the Indenture Establish that the Preferred Shareholders Have Directed the Trustee to Accept the TPS Offer

Under the express terms of Section 10.3 of the Indenture, the Trustee is required to release the portfolio collateral from the lien of the Indenture in accordance with the terms of the offer, against receipt of payment therefor, if the following four conditions are met: 1) an offer to purchase portfolio collateral is made; (2) no event of default has occurred or is continuing; (3) two-thirds of the preferred shareholders vote to accept the offer; and (4) Article XII of the Indenture is complied with. Ind. § 10.3(d). The pleadings establish that all four conditions are met.

First, TPS made an offer to purchase portfolio collateral. In its letter to Wells Fargo, TPS proposed to purchase certain items of portfolio collateral held on behalf of the CDO. *See* Amended Complaint ("Compl.") ¶ 50. With the letter, TPS included a table setting forth the specific items of portfolio collateral subject to its offer and indicating the consideration to be paid for each such item of portfolio collateral. *See id.* For each item of portfolio collateral subject to its offer, TPS made an offer on the same terms to any and all other holders of such item of portfolio collateral. *See id.* Under the Indenture, this constitutes an "Offer." *See* Indenture ("Ind.") § 1.1 (defining an "Offer" with respect to a security as "any offer by [any]

person made to all of the holders of such class of security to purchase or otherwise acquire all such securities . . .").

Second, no event of default has occurred.  The plaintiffs admit this in their complaint and no party contests that allegation.  *See* Am. Compl. ¶ 52; Banc of America Securities LLC Answer ("BAS Ans.") ¶ 52.[7]

Third, on or before the deadline for accepting the offer, at least two-thirds of the preferred shareholders delivered to the Trustee their directions to accept the TPS offer.  The plaintiffs admit this in the pleadings and no party contests that allegation.  *See* Am. Compl. ¶ 58; BAS Ans. ¶ 58.

Fourth, Article XII has unquestionably been satisfied.  That article, in relevant part, forbids the preferred shareholders from accepting an offer if a higher offer is pending at the time of their direction, which there was not.  While the noteholders incorrectly assert that "Section 12.2 has no application to the TPS Offers," BAS Ans. ¶ 117, they nonetheless do not contend that Article XII bars this sale.

Accordingly, because TPS made an offer to purchase portfolio collateral and each of the conditions of Section 10.3 is met, the Trustee is directed by the plain terms of the Indenture to "release from the lien of th[e] Indenture such Portfolio Collateral in accordance with the terms of the Offer . . . against receipt of payment therefor."   Ind. § 10.3(d).  Instead of contesting that the conditions of Section 10.3(d) have been satisfied, the noteholders argue, oddly, that Section 10.3 does not empower preferred shareholders to direct the Trustee to accept an offer.  They claim this is so because the provision does not include the language "accept the offer," but instead

---

[7]Every noteholder answer is materially identical to either the BAS answer or the Hildene answer.  For ease of reference, citations to the noteholder answers and claims will be limited to the BAS and Hildene answers.

instructs the Trustee to "release from the lien of this Indenture such Portfolio Collateral in accordance with the terms of the Offer."   This argument has no merit.

Consistent with the Trustee's actions, by directing the Trustee to release collateral "in accordance with the terms of the offer" and "against receipt of payment therefor," Ind. § 10.3(d) (emphases added), the Indenture indisputably mandates the Trustee's acceptance of the TPS offer.  "Offer" is defined as an offer to "purchase or otherwise acquire" portfolio collateral.  Ind. § 1.1 (emphasis added).  These two provisions make clear that Section 10.3(d)'s instruction to "release" collateral "from the lien" can only be a direction to sell collateral pursuant to the offer "against receipt of payment therefor."  Ind. § 10.3(d).

The noteholders make much of the difference between the language used in Section 10.3(d)—which permits preferred shareholders to direct the Trustee to "release from the lien" the portfolio collateral—and the language in Section 12.2—which explicitly permits preferred shareholders to "direct the Trustee to sell an item of Portfolio Collateral."  This is a distinction without a difference.  The Indenture only permits portfolio collateral to be released from the CDO's lien pursuant to a sale of portfolio collateral, and thus a direction to release the portfolio collateral is equivalent to a direction to sell that collateral.  This is underscored by the language in 10.3(d), which permits a direction to release the collateral "in accordance with the terms of the offer" and "against receipt of payment therefor."  Ind. § 10.3(d).  Such a direction plainly encompasses a direction to sell the collateral.

Moreover, Section 10.3(d) explicitly cross-references and is "subject to" section 12.2, which confirms that both sections concern the same topic: the sale of portfolio collateral.  The difference between Sections 10.3(d) and 12.2 is that, when an offer is made, Section 10.3 permits the preferred shareholders to direct the Trustee to accept the offer (subject to Section 12.2) whereas Section 12.2 permits the shareholders to sell the securities to anyone—whether pursuant

13

to a formal offer or not—provided the price is equal to or greater than the sales price available in the highest offer.  Section 10.3(d) is "subject to" Section 12.2 because an offer may not be accepted if there is a higher pending offer, as provided in Section 12.2.  If Section 10.3(d) did not confer on preferred shareholders the power to direct a sale, then Section 10.3(d) could not be "subject to" Section 12.2.  This interaction between Sections 10.3(d) and 12.2 provides substantial protection to the CDO, in that <u>no</u> sale can ever proceed if there is a buyer standing ready to pay more for an item of portfolio collateral.

     **B.**     **The Noteholders' Alternative Interpretation Has No Support in, and is Contradicted by, the Indenture**

The noteholders resist the straightforward language of Section 10.3(d), language that precisely guided the actions of the disinterested Trustee, an expert in managing CDOs that is charged with executing the Indenture's terms and (unlike the noteholders) was a party to the Indenture.  Instead, they advance an "interpretation" of the Indenture that would result in an unwarranted rewriting of the contract's terms in their favor.

The noteholders claim that when an offer is made, "the Issuers and Trustee have the exclusive rights to sell, and they may not accept the Offer unless it comports with their contractual and fiduciary duties."  BAS Ans. ¶ 70.  On this view—unsupported by any citation to the Indenture—when an offer is made, the Issuer or the Trustee (the noteholders do not specify which) is required to make an initial decision (the noteholders do not specify by what standard) as to whether to accept the offer.  If the Issuer or Trustee approves of the sale, only <u>then</u> does the Trustee transmit the offer to the preferred shareholders under Section 10.3, who vote on whether to release the collateral from the lien of the Indenture.  According to this view, untethered to any provision of the Indenture, Section 10.3(d) only gives the preferred shareholders "the right to <u>veto</u>" the initial decision by the Trustee or Issuer to accept the offer.  BAS Ans. ¶ 72 (emphasis added).  The Indenture easily could have been written to require the

Trustee or Issuer to follow this procedure. But the Indenture says nothing of the sort. Rather, the plain language of the contract vests the exclusive right to direct acceptance of an offer for portfolio collateral in the preferred shareholders.

Although the noteholders repeat eight times in their pleadings that the Issuer and Trustee must evaluate the offer pursuant to their "contractual and fiduciary duties," *see* BAS Ans. ¶¶ 69, 70, 116, 122, 140, 143, 153, the noteholders do not point to a single provision of the Indenture that requires or even permits the Issuer or Trustee to evaluate whether or not to accept an offer. On the contrary, section 6.1(a)(1) of the Indenture expressly disavows the existence of any "implied covenants or obligations," and confirms that the only duties to be performed by the Trustee are those "specifically set forth in this Indenture." Ind. § 6.1(a)(1). As the most vulnerable investors in the CDO, the preferred shareholders were granted the exclusive right to determine whether or not to sell portfolio collateral in response to an offer.

## 1. *Preferred Shareholders Have the Exclusive Right to Direct a Sale*

The noteholders' argument begins with the false premise that "Section 10.3(d) does not, and cannot, alter the principle that the Issuers, as holders, are the <u>only</u> ones who may accept an offer for Portfolio Collateral, whether themselves or through the Trustee." BAS Ans. ¶ 140 (emphasis added). It is plainly false to say that <u>only</u> the Issuer (or the Trustee acting independently of the preferred shareholders' direction) may decide whether to sell portfolio collateral; Section 12.2 gives two-thirds of the preferred shareholders the right to direct the Trustee to <u>sell</u> portfolio collateral that is subject to an offer. *See* Ind. § 12.2 ("Holders representing at least 66-2/3% of the Preferred Shares may direct the Trustee to <u>sell</u> an item of Portfolio Collateral that is the subject of an Offer . . . ." (emphasis added)). However Section 12.2 relates to this particular transaction, it clearly authorizes the preferred shareholders—and no one else—to direct a sale of portfolio collateral. The only other provision in the Indenture that

discusses the procedure for acting on an offer to purchase collateral is Section 10.3(d), which, as discussed, also gives the preferred shareholders the exclusive power to direct the Trustee to accept an offer.

2.      *The Issuer is Precluded from Selling Portfolio Collateral*

In stark contrast to the position taken by the noteholders, the Indenture specifically <u>prohibits</u> the Issuer from selling an item of portfolio collateral, "except as expressly permitted by this Indenture."  *Id.* §§ 7.8(a)(1) (Issuer).  Sections 10.3(d) and 12.2 set forth the only express procedures for the sale of portfolio collateral and they do not grant the Issuer any power to decide independently whether to accept an offer.  Instead, they make clear that the sale of portfolio collateral by the CDO can be predicated solely on the direction of the preferred shareholders. [8]

Further, in the Granting Clause, the Issuer forswore its right to sell by granting to the Trustee "all [its] rights, powers and options" in the portfolio collateral, which includes its right to sell.  Ind. § 1.1 ("Grant").  Similarly, section 7.11 prohibits the Issuer from engaging in "any business or activity" other than issuing and redeeming its shares, and "acquiring, owning, managing, holding and pledging" items in the trust estate.  Ind. § 7.11.  Nowhere does the Issuer retain the power to <u>sell</u> an item of portfolio collateral of its own accord.  The Issuer is also prohibited from acting as an "agent [or] negotiator . . . with respect to any Portfolio Collateral," so it cannot even <u>negotiate</u> a sale.  Ind. § 7.8(a)(5).  Finally, the Trustee alone is empowered to

---

[8]   The noteholders allege that the Issuers are the nominal "owners" of the collateral and that the Issuers are the "holders" of the collateral to which the offers are made.  *See* BAS Ans. ¶ 145.  But these formal designations are irrelevant.  Section 10.3(d) gives the <u>preferred shareholders</u> the exclusive right to direct the Trustee to accept an offer on the Issuer's behalf.

cause an item of portfolio collateral to be <u>transferred</u> out of the Trust Estate, which is required to consummate a sale.[9]

3.    *The Trustee May Not Sell Portfolio Collateral Absent an Event of Default*

As with the Issuer, the Indenture also specifically prohibits the Trustee from selling an item of portfolio collateral, "except as expressly permitted by this Indenture." *Id.* §§ 7.8(a)(1) (Issuer); 7.8(c) (Trustee).   Once again, Sections 10.3(d) and 12.2 set forth the only express procedures for acting on an offer to purchase portfolio collateral and they do not grant the Issuer or Trustee any power to decide whether to accept the offer.   Apart from inapplicable circumstances,[10] no provision of the Indenture expressly permits the Trustee to sell an item of portfolio collateral without direction from the preferred shareholders.[11]   Accordingly, by virtue of the negative covenants in Section 7.8, the Trustee cannot sell an item of portfolio collateral, without direction from the preferred shareholders.

---

[9] The Indenture provides that the portfolio collateral shall be credited to the Collateral Account, Ind. § 10.2, which is maintained by a securities intermediary, Ind. § 6.15(b).   The Indenture further explains that "[t]he Securities Intermediary shall agree to comply with entitlement orders originated by the Trustee without further consent by the Co-Issuers or any other person or entity."   Ind. § 6.15(c).   The UCC defines an "entitlement order" as a "notification communicated to a securities intermediary directing <u>transfer</u> . . . of a financial asset." U.C.C. § 8102(a); *see also SEC v. Credit Bancorp, Ltd.*, 168 F. Supp. 2d 122, 131 (S.D.N.Y. 2001), *aff'd by* 290 F.3d 80 (2d Cir. 2002) (securities intermediaries "are required to honor transfer or liquidation instructions from the 'entitlement holder'").   Thus, the Trustee is empowered to transfer an item of portfolio collateral without the Issuer's consent.   Further, because the securities intermediary may not comply with any entitlement orders originated by a person or entity other than the Trustee, Ind. § 6.15(c), the Issuer does not have the right to transfer an item of portfolio from the Collateral Account.

[10] The sole exceptions, not applicable here, are when the notes become due or an event of default has occurred and is continuing, in which case the Trustee becomes empowered to decide whether to sell an item of portfolio collateral.  *See* Ind. §§ 5.4 – 5.5.

[11] To be sure, several sections of the Indenture vest the Trustee with the blanket authority to <u>consummate</u> sales on behalf of the CDO.   However, Section 7.8 prohibits the Trustee (and Issuer) from exercising that authority except "<u>as</u>" permitted by the Indenture.   The plain meaning of that prohibition is that the Trustee (and Issuer) can exercise its power to sell only in circumstances where the Indenture expressly permits it to do so and only in the express manner in which the Indenture permits it to exercise that power.

Beyond the negative covenant in Section 7.8, the Trustee is also precluded from deciding whether to accept an offer by its covenant to perform "<u>only</u> such duties as are specifically set forth in this Indenture." Ind. § 6.1(a) (emphasis added).  Because no provision of the Indenture specifically sets forth a duty for the Trustee to decide whether to accept an offer, the Trustee is precluded from performing that task.[12]

In light of the foregoing, if, as the noteholders argue, Section 10.3(d) were interpreted to give preferred shareholders a mere <u>veto</u> power over sales to which the Issuer or Trustee initially approved, then Section 10.3(d) would be a nullity because the Issuer or Trustee <u>cannot approve</u> the sale of portfolio collateral in response to an offer.  This interpretation would lead to the absurd result that no party – not the Issuer, not the Trustee, and not the preferred shareholders – would be authorized to approve the sale of an item of portfolio collateral pursuant to an offer, despite the care with which the Indenture describes the proper characteristics of an "offer."  The noteholders' construction of the Indenture must therefore be rejected, not only because it is unsupported and fanciful, but also because a contract should not be interpreted in a way that would render one of its clauses a nullity.[13]

---

[12] The noteholders refer, without explanation, to Section 5.14 of the Indenture, which permits the noteholders to direct the Trustee with respect to its "exercise of any right, remedy, trust or power conferred on the Trustee."  The noteholders fail to note that the Indenture further provides that "such direction shall not be in conflict with . . . any express provision of this Indenture."  *Id.* Sections 10.3, 12.2, and Section 7.18 are express provisions that would conflict with an order by the noteholders not to accept this offer.  The noteholders cannot alter the procedure for approving an offer without <u>amending</u> the Indenture, which tellingly can be done only with the consent of two-thirds of the preferred shareholders, who would be adversely affected thereby.  *See* Ind. § 8.2.

[13] *See Chapman v. New York State Div. for Youth*, 546 F. 3d 230, 236 (2d Cir. 2008) ("A contract should be construed so as to give full meaning and effect to all of its provisions."); *Hartford Fire Ins. Co. v. Orient Overseas Containers Lines (UK) Ltd.,* 230 F.3d 549, 558 (2d Cir.2000) ("[A]n interpretation that gives a reasonable and effective meaning to all terms of a contract is preferable to one that leaves a portion of the writing useless or inexplicable.").

Rather, Section 10.3(d) should be given its straightforward meaning, consistent with the Notices of Offer distributed by the Trustee and as evidenced by the plain text and structure of the Indenture: When an offer to purchase portfolio collateral is made, the Trustee "shall" notify the preferred shareholders of the offer; upon receiving notice of the offer, two-thirds of the preferred shareholders may "direct the Trustee to release from the lien of this Indenture such Portfolio Collateral in accordance with the terms of the Offer in each case against receipt therefor."  Ind. § 10.3(d) (emphases added).[14]   By granting preferred shareholders the power to "direct" the Trustee to release the portfolio collateral from the lien of the Indenture "in accordance with the terms of the Offer," Section 10.3(d), the Indenture vests the preferred shareholders with the authority to instruct the Trustee to abide by the terms of the offer.

If the drafters of the Indenture intended to give the Issuer or the Trustee the power to accept an offer, subject only to the veto power of two-thirds of the preferred shareholders, they could have done so easily.  In other sections of the Indenture, the drafters had no difficulty in drafting similar provisions that permit the Issuer to make a decision subject to the veto power of the preferred shareholders.  See Ind. § 9.1(a) ("The Notes shall be redeemable . . . at the option of the Issuer, with the written consent, or at the direction, of Holders representing at least 66-2/3% of the Preferred Shares." (emphasis added)); see also Ind. § 12.3(a) ("The Issuer (with the consent or at the direction of Requisite Noteholders and, to the extent adversely affected thereby, at least 66-2/3% or more of the Preferred Shares) may enter into any amendment of or supplement to any Underlying Instrument . . . ." (emphasis added)).  They did not do so in the context of an offer to purchase portfolio collateral; in fact, the express distinction between

---

[14]   The use of the word "shall" demonstrates a further contradiction in the noteholders' construction.  If the Issuer (or Trustee) were required to make the initial decision whether to accept an offer, it would make no sense to require, as Section 10.3 does, that every offer, including an offer rejected by the Issuer or Trustee, "shall" be transmitted to the preferred shareholders for an exercise of their "veto" power.

"consent" and "direction" in these provisions make clear that Section 10.3(d) vested the preferred shareholders with decision-making authority over offers.

### 4. The Trustee and Issuer Have No Fiduciary Duties

The noteholders next argue that, if the Indenture is interpreted to permit the preferred shareholders to accept the offer, the Trustee should decline to accept the offer in exercise of its "fiduciary duty" because the offer is for "fire-sale prices" (despite the fact that no higher offer for the securities had been made)[15] and the consent payments constitute a bribe to shareholders. *See* Hildene Ans. ¶ 138, 165. This fiduciary duty purportedly requires the Trustee to determine "whether an offer is in the best interests of the Issuer and its creditors as a whole." BAS Ans. ¶ 140. In so arguing, the noteholders attempt to impose on the Trustee fiduciary duties that are disavowed by the Indenture and New York law.

"New York state and federal case law are consistent with section 77ooo(a)(1) of the [Trust Indenture] Act," *AG Capital Funding Partners, L.P. v. State Street Bank and Trust Co.*, 11 N.Y.3d 146, 156 (2008), which sharply distinguishes between the duties of an Indenture Trustee prior to, and after, an event of default. <u>After</u> an event of default, the Trustee must "act prudently to safeguard the assets of the Trust," broadly exercising its powers and rights to protect those assets even in the absence of specific provisions requiring action. *LNC Investments v. First Fidelity Bank*, 173 F. 3d 454, 462 (1999).

Where, as here, there has been no event of default, it is "well-established under [New York] state common law that the duties of an indenture Trustee are <u>strictly defined and limited to the terms of the indenture</u>." *Elliott Assoc. v. J. Henry Schroder Bank & Trust Co.*, 838 F.2d 66, 71 (2d Cir. 1988) (emphasis added). In particular, the Second Circuit has "consistently rejected

---

[15] Although the Court need not assess the validity of this allegation, it is worth noting that there is no evidence that these offers are for anything less than fair market value. In fact, the absence of a higher offer suggests that TPS's offer represents the actual market value of the securities.

the imposition of additional duties on the Trustee" beyond those explicitly provided in the

Indenture.  *Id.*  As the New York Court of Appeals recently explained,

> The corporate Trustee has very little in common with the ordinary Trustee.
> The Trustee under a corporate indenture has his or her rights and duties
> defined, <u>not by the fiduciary relationship, but exclusively by the terms of the</u>
> <u>agreement</u>.  His or her status is more that of a stakeholder than one of a
> Trustee.

*AG Capital Funding Partners, L.P. v. State Street Bank and Trust Co.*, 11 N.Y.3d 146, 156

(2008) (quotation marks and alterations omitted; emphasis added).  *See also Elliott Assoc.*, 838

F.2d at 71 ("An indenture Trustee is not subject to the ordinary Trustee's duty of undivided

loyalty.  Unlike the ordinary Trustee, who has historic common-law duties imposed beyond

those in the Trust agreement, <u>an indenture Trustee is more like a stakeholder whose duties and</u>

<u>obligations are exclusively defined by the terms of the indenture agreement</u>.") (emphasis in

original) (quotation marks omitted)).

The sole duty of an indenture Trustee is "to perform its ministerial functions with due

care" and to avoid conflicts of interest.  *Id.* at 157.  Indeed, a trustee's failure to perform its

duties does not constitute a breach of a <u>fiduciary</u> duty.  *See id.*  Simply put, "[s]o long as the

Trustee fulfills its obligations under the express terms of the indenture, it owes the debenture

holders no additional, implicit pre-default duties or obligations except to avoid conflicts of

interest." *Elliott Assoc.,* 838 F.2d at 71.

The CDO IV Indenture, in harmony with this longstanding jurisprudence, explicitly

limits the Trustee's duties to those specifically described in the Indenture:

> The Trustee undertakes to perform such duties and <u>only such duties as are</u>
> <u>specifically set forth in this Indenture</u>, and no implied covenants or
> obligations shall be read into this Indenture against the Trustee.

Ind. § 6.1(a)(1) (emphasis added).  By contrast, when an event of default "has occurred

and is continuing," the Indenture explicitly gives the Trustee the power to sell portfolio

collateral, even absent an offer. *See* Ind. §§ 5.4, 5.5, 5.18.   In arguing that the Trustee must decline this direction because the Trustee is obligated, by an extra-contractual fiduciary duty, to determine whether the offer is in the best interests of the creditors, the noteholders confuse the pre-default and post-default duties of this indenture Trustee.

In an attempt to avoid the overwhelming weight of this authority and the plain text of the Indenture, the noteholders point to the <u>heading</u> of one provision in the Indenture, entitled "Fiduciary For Noteholders." *See* Ind. § 6.17; BAS Ans. ¶ 191 (contending that Section 6.17 imposes a fiduciary obligation on the Trustee with respect to the noteholders).  But by the express terms of the Indenture, this heading is to be given no weight in interpreting the Indenture. *See* Ind. § 13.5 ("The Article and Section headings herein . . . are for convenience only and shall not construct the construction thereof.").  In any event, "fiduciary" cannot be read, in light of the contract's express disavowal of any implied obligations, as anything more than a reference to the expressly articulated duties set forth in the Indenture, none of which includes the broad, discretionary power to accept or reject a valid offer.[16]

Accordingly, contrary to the noteholders' contention, the Trustee does not owe the noteholders a fiduciary duty, implicit or otherwise, to evaluate the propriety of an offer prior to accepting it.[17]  The Trustee's sole obligation is to abide by the express terms of the Indenture.

---

[16] Section 6.17 simply states that when an item of collateral is delivered to the Trustee, it is delivered to, and possessed by, the Trustee as Trustee for the noteholders.  The cursory title in no way alters the fact, explicitly laid out in Section 6.1(a)(1), that the Trustee is obligated to perform those and <u>only those duties</u> that are specifically set forth in the Indenture. *See Northeast Gen. Corp. v. Wellington Adv., Inc.*, 82 N.Y.2d 158, 162 (1993) (noting that a party's function, rather than its title, drives the analysis of whether the party owes fiduciary duties).

[17] Indeed, the Indenture specifically provides that "the Trustee shall not be bound to make any investigation into the facts or matters stated in any . . . direction . . . or other paper or documents received by it."  Ind. § 6.3(f).

An analysis of the Trustee's actions here is "therefore limited to determining whether the trustee fulfilled its duties under the indenture." *Elliott Ass.*, 838 F.2d at 71.[18]

The noteholders also allege that the Issuer owes a fiduciary duty to the noteholders. They cite no provision in the Indenture that supports this view. The Issuer and noteholders, as stakeholders, owe each other no fiduciary duties. *See Ellis Assoc.*, 838 F.2d at 71 (noting that the duties of a "stakeholder . . . are exclusively defined by the terms of the indenture"). Further, under New York law, non-explicit fiduciary duties are read into contracts only in rare circumstances, not present here, because if sophisticated parties "do not create their own relationship of higher trust, courts should not ordinarily transport them to the higher realm of relationship and fashion the stricter duty for them." *Northeast*, 82 N.Y.2d at 162. Nothing in the Indenture or in the noteholders' pleadings provides any ground for departing from the ordinary rule—rigidly followed in the context of indentures—that the contract defines the terms of the relationship.

### 5.   *While the Offer is Fair, Its Fairness is Irrelevant*

Finally, the noteholders argue that the TPS offer is unfairly low and that "conferring the exclusive right to accept or reject offers on the Preferred Shareholders" would "turn the logic and structure of the CDOs" on its head. BAS Ans. ¶ 137. The noteholders present a parade of horribles, noting, for example, that if the preferred shareholders had the power to direct the

---

[18] The same considerations defeat Hildene's claim that the Trustee and Issuer breached the implied covenant of good faith. *See* Hildene Ans. ¶¶ 152-166, Claim 2. Even if such a covenant applied, it cannot alter the fact that the Trustee's duties are strictly defined by the Indenture. *See Argonaut Partnership L.P. v. Bankers Trustee Co. Ltd.* 2001 WL 585519 *2 (S.D.N.Y. May 30, 2001) (dismissing claim for breach of implied covenant of good faith because explicit terms of indenture not breached); *see also Wells Fargo Bank Minnesota, N.A. v. Nassau Broadcasting Partners, L.P.*, 2003 WL 22339299 (S.D.N.Y. Oct. 10, 2003) (noting that even explicit "good faith" provision does not extend duties of indenture trustee beyond those defined in indenture). Further, Hildene fails to cite any provision in the Indenture that the Issuer failed to comply with in good faith. No such provision exists because the Issuer has no non-administrative duties relating to the sale of portfolio collateral.

acceptance of the offer, then "the Preferred Shareholders could accept a third party offer to purchase all the underlying securities for a nominal amount (e.g., 1%)." *Id.* ¶ 138.[19]   This argument carries no weight for two reasons.

First, the terms of the Indenture, properly understood, entrust this power to preferred shareholders and provide ample protection against unfair offers.   The plain terms of the Indenture grant preferred shareholders the power to direct a sale—a power that the noteholders are forced to concede, *see* BAS Ans. ¶ 117 (discussing Ind. §12.2)—with no limitation based on the price or fair value of the offer.   It therefore makes no sense to say that conferring the same power on preferred shareholders in the context of Section 10.3(d) that they concededly already possess in the context of Section 12.2 would turn the logic of the CDO on its head.   Further, Section 12.2, as discussed, sets a <u>floor</u> for the price at which securities can be sold: the price of the highest offer.   This protects against the scenario the noteholders fear, because any low-ball offer would readily be exceeded by a better offer until a fair market price was reached.   In this instance, had any better offer been made for the particular securities at issue, the preferred shareholders would not have been permitted to accept the TPS offer.[20]

Second, and more fundamentally, the noteholders simply cannot read implied protections into the Indenture.   As discussed in more detail below, *see* IV(a) *infra*, when faced with arguments by noteholders that actions neither prohibited nor permitted by an Indenture should be enjoined as "unfair," courts applying New York law have consistently "declined to read into

---

[19] The noteholders allege that this is especially unfair in the context of a consent payment.  *See id.*  The propriety of the consent payment will be addressed in a later section.

[20] Although it is not relevant to this motion, TPS maintains, of course, that these offers were fair.  As Hildene acknowledges, "due to recent market conditions" the CDOs have suffered "significant losses," Hildene Ans. ¶ 137, which decreases the value of their holdings far below "face value."   The best indication of the fairness of the TPS offer in respect of CDO IV is that (a) its five other similarly structured offers were <u>all rejected</u> and (b) there was no higher offer for any of these securities.

indentures provisions and protections that are not there."  *In re Solutia, Inc.*, 2007 WL 1302609 (Bankr. S.D.N.Y., May 1 2007).  *See also Metropolitan Life Ins. Co. v. RJR Nabisco, Inc.,* 716 F. Supp. 1504 (S.D.N.Y. 1989); *Hartford Fire Ins. Co. v. Federated Dep't Stores, Inc.,* 723 F. Supp. 976, 991 (S.D.N.Y. 1989).   Whether the TPS offer is "fair"[21] is immaterial; under well-established law, all that matters is whether the offer was approved in accordance with the plain terms of the Indenture.

For the foregoing reasons, the plain terms of the Indenture require the Trustee to accept the terms of the TPS offer.

## III.    The Noteholders' Cross- and Counter-Claims are Meritless

### A.    Reformation

In their cross- and counter-claims, the noteholders raise various other objections to the completion of this sale.   First, implicitly conceding that the plain terms of the Indenture contradict their position in this case, the noteholders seek the alternative relief of reformation of the terms of the Indenture on grounds of "mutual mistake."   BAS ¶ 152.   Specifically, the noteholders argue that "[t]he parties intended the pools of Portfolio Collateral . . . to be sold only by the Issuers or Trustee in the exercise of their contractual and fiduciary obligations." *Id.* ¶ 152. This argument is meritless.

"Reformation is not granted for the purpose of alleviating a hard or oppressive bargain, but rather to restate the intended terms of an agreement when the writing that memorializes that

---

[21]  "Fairness," in the noteholders' view, seems to fluctuate depending on the financial circumstances of the CDO.   But what matters here is that the drafters of the Indenture, as reflected in the terms they chose, elected to vest this right in the preferred shareholders.   The reason is apparent: the first-loss investors (i.e., the preferred shareholders), as opposed to the holders of AAA notes, would be the best judges of what a good offer would be, since they were the only ones who expected they might have anything to lose. The terms were plainly comprehensible by any prospective CDO investor who chose to read the Indenture prior to the purchase of securities – whether notes or preferred shares – and the contract should not now be re-written after those purchases.

agreement is at variance with the intent of both parties." *George Backer Management Corp. v. Acme Quilting Co.,* 46 N.Y.2d 211, 219 (1978). "[T]o overcome the heavy presumption that a deliberately prepared and executed written instrument manifested the true intention of the parties, evidence of a very high order is required." *Id.* When there is no mutual mistake, "the mistake of a single party as to a term of the contract does not justify reformation under New York law." *AMEX Ass. Co. v. Caripides,* 316 F.3d 154, 162 (2d Cir. 2003).

The noteholders cannot seek reformation of the Indenture for three independent reasons. First, the noteholders were not parties to the original Indenture. Reformation is used to conform a contract to the original intent of the contracting parties. Although the noteholders became bound by the Indenture when they purchased the notes, they did not participate in the drafting of the Indenture or execute the Indenture. *See* Ind. Execution Pages, pp. 113-15 (The Issuers and Wells Fargo, as Trustee, are the only signatories to the Indenture). Thus, for purposes of evaluating whether the contract conforms to the original intent of the contracting parties, the intent of the noteholders is irrelevant.

Second, even if the noteholders' intent were relevant, the noteholders fail to plead a mutual mistake because, as the noteholders acknowledge, the Trustee acted in direct opposition to the interpretation now advanced by the noteholders—to wit, that the Trustee must independently evaluate the merits of an offer. *See* BAS ¶ 123 (conceding that the Trustee, in its Notices of Offer, interpreted Section 10.3(d) to permit preferred shareholders to direct the Trustee to accept the offer). Because the Trustee—an original party to the contract, *see* Ind. Execution Pages—has consistently followed the language of the Indenture, in contrast to the noteholders' views, there is no mutual mistake to warrant reformation. *See AMEX Ass.*, 316 F.3d at 162 ("[T]he mistake of a single party as to a term of the contract does not justify reformation under New York law.").

Finally, the noteholders' description of the "unmistakable intent" of the parties is facially implausible.  As the noteholders acknowledge, the Indenture explicitly allows the preferred shareholders to direct the Trustee to <u>sell</u> portfolio collateral for a price that is equal to or greater than the price available pursuant to an offer.  *See* Ind. § 12.2.  Thus, it is facially implausible to allege that the unmistakable intent of the parties was that portfolio collateral could be sold "only by the Issuers or Trustee."  BAS ¶ 152.  In sum, when a non-party jarringly misreads contractual language, it is not "mutual mistake"; it is simply a mistake.

### B.    Expiration of Offer

The noteholders also seek a declaration that the offer has expired and is no longer capable of being accepted because "<u>the Issuers or the Trustee</u> did not accept the offer by October 29, 2009," which was the "Direction Expiration Date" for the offer.  BAS ¶ 162-63 (emphasis added).  This argument is frivolous.

The expiration date explicitly referred to the date by which the <u>preferred shareholders</u> were required to submit their <u>direction</u>, not the date by which the Trustee was required to accept the offer.  This was explicit in both the TPS offer and in the Trustee's Notice of Offer.  *See* TPS Offer ("The CDO must receive such direction by . . . October 29, 2009"); Trustee Notice of Offer (requiring preferred shareholders to "deliver . . . each Direction . . . on or before the Direction Expiration Date.").  Lest there be any doubt, as is made clear by its pleadings and in TPS's letter of October 30, 2009 to the Trustee, TPS was willing and ready, and remains "willing and ready," to complete the transaction.  TPS Ans. St. of Claim ¶ 9.  Indeed, it was the noteholders themselves—through their baseless threats of litigation—that prompted the Trustee to hold off on acceptance of the TPS offer, and they should not be allowed to benefit from those unwarranted protests.

C.      **Fraudulent Conveyance**

The noteholders next seek a declaration that the transaction, if consummated, would be in violation of Section 273 of New York's Debtor and Creditor Law, which prohibits fraudulent conveyances.  The claim is wholly without merit.  First, this claim is not supported by <u>any</u> factual pleadings and is thus facially deficient under Fed. R. Civ. P. 8.  A transfer is a fraudulent conveyance under Section 273 only if (a) the transfer renders the transferor insolvent and (b) the transfer is for less than fair consideration.  *See* N.Y. Debt. & Cred. Law § 273.  The noteholders make a conclusory allegation that the transfer would render the CDO insolvent, but give <u>no</u> <u>factual allegations</u> to support or explain the basis of this allegation.  Rather, the noteholders simply recite the elements of Section 273 and assert that the Section is violated. BAS Ans. ¶¶ 168-69.  It is hornbook law that such "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to state a cause of action. *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) ("[P]leadings that . . . are no more than conclusions . . . are not entitled to the assumption of truth.  While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations.").  For this reason, the claim must be dismissed.  *See, e.g., In re Gluth Bros. Const., Inc.*, 2009 WL 4037795 *6 (Bankr. N.D. Ill. November 19, 2009) (dismissing fraudulent conveyance claim, brought under identically worded Illinois uniform fraudulent conveyance act, because plaintiff offered "no factual allegations to support its claim that [defendant] was insolvent at the time of the transfer" and therefore "under the standard set forth in *Iqbal*, the Plaintiff has failed to plead this element").

Second, this claim is barred by the "no action" clause in the Indenture.  The no action clause in the CDO IV indenture prohibits noteholders from bringing suit "with respect to the indenture" unless they first: (a) give notice to the Trustee of an event of default and (b) ask the

Trustee to file suit.   *See* Ind. § 5.9.   Courts routinely hold that noteholders cannot bring fraudulent conveyance claims unless they adhere to no action clauses of this kind.  *See, e.g.*, *In re Enron Corp. Securities, Derivative & "ERISA" Litigation*, 2008 WL 744823 (S.D. Tex. 2008) (applying no action clause that prohibited suit "upon or under or with respect to this Indenture" to bar noteholder fraudulent conveyance claim); *McMahan & Co. v. Wherehouse Entertainment, Inc.*, 859 F. Supp. 743, 749 (S.D.N.Y. 1994) (debenture holders barred from bringing state common law claims for fraudulent conveyance under no action clause in trust indenture), *aff'd in part, rev'd in part on other grounds*, 65 F.3d 1044, 1051 (2d Cir.1995) (noting with approval that "[i]n this case plaintiffs failed to comply with the no-action clause, and, as a result, the district court rules that their state-law claims were barred."); *Victor v. Riklis*, No. 91 Civ. 2897, 1992 WL 122911, *6 (S.D.N.Y. May 15, 1992).   The no action clause bars the noteholders' fraudulent conveyance claim in this case because the Trustee has not received notice of an event of default, and no such event has occurred.  *See* Am. Compl. ¶ 52 (no notice of event of default); *see also U.S. Bank Nat'l Ass'n v. U.S. Timberlands Klamath Falls, L.L.C.*, 2004 WL 1699057 (Del.Ch. July 29, 2004) (applying New York law and barring fraudulent conveyance claim brought by trustee because there had not been an event of default); *see also Elliott Assoc. v. Bio-Response, Inc.*, 1989 WL 55070 (Del.Ch. May 23, 1989) (applying New York law and barring statutory claim seeking to declare issuer insolvent based on the no action clause because the noteholders had not alleged that there had been a default in the indenture).

### D.    Tortious Interference with Contract

The noteholders bring a direct claim against TPS for tortious interference with contract. This claim is incoherent.   "Tortious interference with contract requires," *inter alia*, "actual breach of the contract."  *Lama Holding Co. v. Smith Barney, Inc.*, 88 N.Y.2d 413, 424 (1996) (emphasis added).  Because no transaction has yet occurred, there cannot have been an actual

breach of contract.   The noteholders concede this.   They argue only that "[i]n the event the Portfolio Collateral of Tropic IV is sold under the terms of the Offer," TPS "will have caused" a breach.   BAS Ans. ¶ 182 (emphasis added).   Because there is no allegation of an actual breach, there is not yet any possible claim for tortious interference with contract.   Further, as discussed above, the plain terms of the Indenture permit the preferred shareholders to direct the Trustee to accept the offer, so once the Trustee accepts the offer, there will still be no breach of contract. The claim must be dismissed.

For the foregoing reasons, the Court should direct the Trustee to deliver the items of portfolio collateral to TPS in exchange for the payment tendered.[22]   The only remaining question is whether the consent payment belongs to the Trust or to the preferred shareholders.   The next section establishes that the consent payment, as a matter of law, belongs to the preferred shareholders.   No matter how this second issue is decided, however, the Trustee must deliver the portfolio collateral to TPS in exchange for the prices listed in the exhibits of the CDO IV Notices of Offer, pursuant to the direction of two-thirds of the preferred shareholders.

## IV.    TPS's Consent Payments to the Preferred Shareholders are Fully Authorized

TPS offered to pay consenting shareholders a fee totaling five percent of the aggregate principal amount of the securities under offer.   The noteholders advance three arguments to thwart this consent payment: (a) the Indenture impliedly precludes consent payments; (b) the consent payment belongs to the Trust estate as proceeds from the sale; (c) the consent payment

---

[22] The noteholders also seek a declaration that two preferred shareholders effectively withdrew their directions and that any preferred shareholders may do so presently.  *See* BAS Ans. ¶¶ 184-195, Claim VII.  The Court need not reach this issue because it is moot: even without these two directions, two-thirds of the preferred shareholders approve the offer.  On its merits, the claim fails because the preferred shareholders' direction became "effective when [it was] delivered to the Trustee."  Ind. § 13.2.  Further, the deadline for the preferred shareholders to take a position on the offer has passed.

belongs to the Trust as Collateral Interest Collections or Collateral Principal Collections.  Each argument fails.

### A.      Implied Covenant

There is nothing in the Indenture that prohibits consent payments.  The noteholders argue that the Indenture impliedly precludes them because consent payments are unfair to noteholders.  As noted, the Indenture specifically disavows implied covenants.  Ind. § 6.1(a).  Further, when faced with arguments by noteholders that actions neither prohibited nor permitted by an Indenture should be enjoined as unfair, courts applying New York law have consistently "declined to read into indentures provisions and protections that are not there."  *In re Solutia, Inc.*, 2007 WL 1302609 (Bankr. S.D.N.Y., May 1 2007).  *See also Metropolitan Life Ins. Co. v. RJR Nabisco, Inc.,* 716 F. Supp. 1504 (S.D.N.Y. 1989); *Hartford Fire Ins. Co. v. Federated Dep't Stores, Inc.,* 723 F. Supp. 976, 991 (S.D.N.Y. 1989).  In indentures, covenants derive their substance directly from the language of the indenture and "cannot give the holders of Debentures [i.e., noteholders] any rights inconsistent with those set out in the Indenture."  *Broad v. Rockwell,* 642 F.2d 929, 957 (5th Cir. 1981) (*en banc*) (applying New York law).

For example, in *Metropolitan Life,* the bondholders sued the company for a breach of the implied covenant of good faith and fair dealing when the company agreed to a leveraged buyout that unfairly reduced the investment quality of their bonds to near "junk" status.  716 F. Supp at 105-06.  The indenture at issue in *Metropolitan Life* contained no explicit provision that either permitted or prohibited a leveraged buyout.  *See id.* at 1515.  The court declined to "shoehorn into an indenture additional terms plaintiffs now wish had been included" because "courts are properly reluctant to imply into an integrated agreement terms that have been and remain subject to specific, explicit provisions, where the parties are sophisticated investors, well versed in the market's assumptions, and do not stand in a fiduciary relationship with one another."  *Id.* at

1519, 1522.  The court further noted that the market presumptively discounted the value of the bonds because of the Indenture's lack of protection against leveraged buyouts.  *See id* at 1522. In *Hartford Fire*, which presented a similar fact pattern, the court noted that implying an extra term would be "especially troubling in light of the fact that the Indenture could easily have been drafted to incorporate expressly the terms the Plaintiffs now urge this court to imply." 723 F. Supp. at 992.  Finally, in *In re Solutia*, the noteholders alleged that the debtor improperly caused the release of an "equal and ratable lien" from the Trust estate.  *See In re Solutia*, 2007 WL 1302609 at *1.  Again, the Indenture did not contain an explicit provision either permitting or prohibiting the debtor's actions and the court declined to "read into an indenture with a plain and clear meaning the vague and unclear implied covenant that the Noteholders desire." *Id.* at *12.

In *Katz v. Oak Industries Inc.*, applying Delaware law, the court rejected the identical argument made here – to wit, that the indenture contained an implied provision prohibiting the inducement of consent votes:

> There is nothing in the indenture provisions granting bondholders the power to veto proposed modifications in the relevant indenture that implies that [another party] may not offer an inducement to bondholders to consent to such amendments.  Such an implication, at least where, as here, the inducement is offered on the same terms to each holder of an affected security, would be wholly inconsistent with the strictly commercial nature of the relationship.

508 A.2d 873, 881 (Del.Ch. 1986) (emphasis added).

As in *Metropolitan Life*, *Hartford Fire*, *In re Solutia*, and *Katz*, the Indenture in this case does not contain an explicit provision prohibiting the actions undertaken here.  Consent payments are common in financial transactions and the Indenture could easily have been drafted to preclude them expressly.  All parties with a stake in the Indenture were sophisticated investors and they and the market presumptively took account of the preferred shareholders' power to sell

the securities in setting the price both for the notes and the preferred shares.[23]  Because nothing in the Indenture prohibits third parties from offering an inducement to preferred shareholders to exercise their voting powers, such an implication would be entirely inconsistent with the strictly commercial nature of the relationships.  In short, they are entitled to the benefit of the "terms of the negotiated contract to the letter without being mulcted for lack of good faith."  *In re Kaplan,* 143 F.3d 807, 818 (3d Cir. 1998).

### B.    Proceeds

The noteholders next argue that, assuming the Indenture does not prohibit consent payments, the consent payments belong to the Trust estate as "proceeds" from the sale under Section 10.3(e)(i).  This argument, at the outset, makes little sense.  Consent payments by definition are paid directly to individuals in compensation for an exercise of their voting rights. It would be inconsistent for the Indenture to <u>permit</u> preferred shareholders to receive consent payments—which it does, as discussed in the preceding section—and yet attempt to <u>collect</u> those payments on behalf of the Estate, because this would simply function to prohibit the consent payment by other means.

Moreover, the language of the Indenture confirms that the Trustee cannot collect consent payments made to preferred shareholders.  First, Section 10.3(e)(i) of the Indenture provides that "the Trustee shall credit all proceeds <u>received *by it*</u> from the disposition of Portfolio Collateral to the Collection Account."  Ind. § 10.3(e)(i) (emphasis added).  In soliciting their direction, the

---

[23]  In fact, Hildene candidly explained the rationale for giving the preferred shareholders the right to sell the portfolio collateral.  *See* Hildene Ltr. ("In return for receiving all of interest remaining after paying the Issuers' costs, including interest on the notes, the Preferred Shareholders accepted the risk of the first losses to be incurred on the respective portfolios.  When originated, the Preferred Shareholders were the most-likely to be impacted by a sale of any assets, so it was initially reasonable to confer on them the right to approve the sale by the Issuer of assets subject to offer.").  The market presumptively accounted for these exchanges of rights and risks in setting the price for the notes and the preferred shares.

Trustee made the preferred shareholders agree that, under the terms of the TPS letter, "the Consent Payment will <u>not be received by the Trustee</u> or the Issuer for distribution to the Holders of the Preferred Shares."  Buchdahl Decl., Exh. 2, Direction to Accept Offer (emphasis added). Thus, by the plain terms of the TPS letter and Section 10.3(e)(i), the consent payment, which is not "received by" the Trustee, is not credited to the Estate.  If the drafters of the Indenture wished to channel consent payments into the Trust Estate, they easily could have done so in express terms.  Far from expressing such an intent, the Indenture expressly provides that consent payments, which are not "received by" the Trustee, do not belong to the estate.

Second, consent payments are not "proceeds" from the disposition of the sale—i.e., payments made in exchange for the securities—but rather payments that compensate an exercise of voting rights.  The use of "proceeds" in Section 10.3(e)(1) immediately follows Section 10.3(d), which directs the Trustee to release the portfolio collateral "against receipt of [the] payment therefor" promised in the offer.   Under the explicit terms of the offer, the "payment therefor" regarding the collateral was $3.45 million.[24]  In addition to that "payment therefor," consenting preferred shareholders are promised $3.45 million in compensation for their voting rights.  Under common usage and the plain terms of the Indenture and the TPS offer, the consent payment is not payment <u>for</u> the security, but payment for the exercise of contractual rights.  It is therefore not part of the "proceeds" from the disposition of the collateral; it is certainly not part of the "proceeds <u>received by</u>" the Trustee.

Third, the Indenture explicitly directs that "payments . . . received pursuant to a consent or similar <u>solicitation</u>" belong to Collateral Interest Collections.  Ind. § 1.1 (Definition of "Collateral Interest Collections").  These are payments made to the <u>Issuer</u> for agreeing to <u>amend</u>

---

[24] This is stated in the Appendix to the Offer, which lists the "sales price" as $3.45 million and the "consent payment" as $3.45 million.

an underlying security.[25]   *See id.* § 1.1 (defining "Offer" in relevant part as "any <u>solicitation</u> by the issuer of such security or any other Person to <u>amend</u>, modify or waive any provision of such security or any related Underlying Instrument" (emphases added)); § 12.3 (granting the <u>Issuer</u> the power to enter into amendments of underlying instruments under certain conditions, "with the <u>consent</u>" or at the direction of the noteholders and, at times, the preferred shareholders).   The Issuer, unlike the preferred shareholders, is a party to the Indenture, which has granted to the Trust Estate all its interest in profits from the disposition of portfolio collateral.   Thus, the Indenture sensibly prohibits the Issuer from retaining any payments made to amend an underlying security.   By contrast, the preferred shareholders are not parties to the Indenture, and nothing in the Indenture purports to preclude them from receiving and retaining private compensation for an exercise of their voting powers.   The fact that the Indenture explicitly collects payments made to the Issuer for consenting to amend an underlying security, but does not explicitly collect payments made to preferred shareholders for exercising their voting powers, confirms that the Indenture does not contemplate that the latter payments will be collected.

Once again, the Trustee's actions accord with the plain meaning of the Indenture by requiring the preferred shareholders to agree that the Trustee and the Issuer will not be "involved in" the consent payment and that the consent payment "will <u>not be received by</u> the Trustee or the Issuer."   Buchdahl Decl., Exh. 2 Direction to Accept Offer (emphasis added).   Under this straightforward reading of the Indenture, the consent payment is not collected by the Trustee for the benefit of the Trust Estate.

---

[25]   Significantly, the definition of Collateral Interest Collections explicitly <u>excludes</u>, in a subsequent subsection, any "<u>fees and commissions received in connection with the purchase of Portfolio Collateral</u>."   *Id.* (emphasis added).

### C.   Collateral Interest/Principal Collections

The noteholders argue, finally, that the <u>definitions</u> of "Collateral Interest Collections" ("CIC") and "Collateral Principal Collections" ("CPC") authorize the Trustee to seize the consent payments. *See* Ind. §1.1. This argument has no merit. These definitions do not set forth what the Trustee is <u>entitled</u> to collect. Rather, they explain how payments that the Trustee is <u>otherwise</u> entitled to collect are channeled into the Collections account.

Section 10.1 permits the Trustee to demand payment and delivery of all money and property that is "<u>payable to</u> or <u>receivable by</u> the Trustee pursuant to the Indenture." Ind. § 10.1 (emphasis added). It then provides that the Trustee shall "segregate and hold" all such money and property in one of five securities accounts, one of which includes Collections. *Id.* §§ 10.1, 10.2. Collections, in turn, is defined solely as "the sum of (i) the Collateral Interest Collections <u>collected</u> during the applicable Due Period . . . and (ii) the Collateral Principal Collections <u>collected</u> during the applicable Due Period." *Id.* § 1.1 (definition of "Collections") (emphasis added).

Under section 10.1, the Trustee cannot demand payment of the consent fee unless the consent fee is made "payable to or receivable by" the Trustee. Critically, however, the definitions of Collateral Interest and Principal Collections do <u>not</u> independently make any sums "<u>payable</u> to or <u>receivable</u> by" the Trustee. Rather, they simply categorize certain types of "<u>received</u>" or "<u>collected</u>" funds for the purpose of channeling those funds into the Collections account. By contrast, to determine which funds are <u>receivable</u> by the Trustee—the only question relevant here—one must turn to the operative section of the Indenture that governs the sale of portfolio collateral (not the definition section), which provides that the Trustee shall complete the offer "against receipt of payment therefor." *Id.* § 10.3(d). Thus, what is "<u>receivable</u> by the Trustee pursuant to the Indenture," and hence collectible by it, is solely the "payment therefor"

promised in the offer.  As explained above, this does not include a consent fee that is made payable to the preferred shareholders for an exercise of their voting powers.

Further, these definitions are simply inapplicable to the sale of portfolio collateral.  First, the definition of Collateral Interest Collections explicitly <u>excludes</u> any "fees and commissions <u>received in connection with the purchase of Portfolio Collateral</u>" and the definition of Collateral Principal Collections contains no provision directly affecting fees received in connection with the purchase of portfolio collateral.  Second, and more importantly, section 10.2(a), which defines the relevant accounts into which received funds are channeled, specifically distinguishes "Collections" from proceeds that are received in connection with a sale of portfolio collateral. *See* Ind. § 10.2 (enumerating three separate sources of funds that are all to be credited into the Collection Account: "(i) all Collections [i.e., "the sum of (i) the Collateral Interest Collections . . . and (ii) the Collateral Principal Collections," Ind. § 1.1], (ii) all amounts required to be credited thereto pursuant to Section 10.3(e)(i) hereof [i.e., "proceeds received . . . from the disposition of Portfolio Collateral," Ind. § 10.3(e)(i)], and (iii) all payments received from the Swap Counterparty under the Swap Agreement").  Because "Collections" comprises the sum of Collateral Interest and Principal Collections, and Collections is distinct from proceeds received from the disposition of portfolio collateral pursuant to Section 10.3(e)(i), it follows that the definitions of Collateral Interest and Principal Collections do not pertain to the sale of portfolio collateral whatsoever.  Rather, section 10.3(e)(i), which is the specific provision that relates to this issue, governs how proceeds received from the disposition of portfolio collateral are channeled into the relevant account.[26]

---

[26] This conclusion comports with the general interpretive principle that the specific provision governing a subject (section 10.3) controls over other, broader provisions that are not directly on point (the definition of Collections).  *See, e.g.*, *Aramony v. United Way of America*, 254 F.3d 403, 413 (2d Cir. 2001) ("[I]t is a fundamental rule of contract construction that 'specific terms

Both section 10.3(e)(i) and the definitions of Collateral Interest and Principal Collections limit the Trustee's collection of proceeds to proceeds that are "<u>received</u>" by the Trustee itself. Ind. § 10.3(e)(1).  Consent fees that are never received by the Trustee and instead are payable to the third-party preferred shareholders are not credited to the CDO Estate and are not sale proceeds received by the Trustee, especially, where, as here, the payment of such fees is not a precondition to the acceptance of the purchase offer.  By requiring the preferred shareholders to agree that the Trustee would not receive the consent payment, the Trustee's actions dovetailed with the plain terms of the Indenture, which permits the payment of consent fees directly to preferred shareholders.   This conclusion follows both from the unambiguous terms of the relevant provisions and from the fact the Indenture contains no provision that prohibits consent payments to preferred shareholders.   Once again, the noteholders attempt to invent new Indenture provisions, after the fact, for their own benefit and to the detriment of other stakeholders in the CDO.  This attempt should be rejected by this Court.

---

and exact terms are given greater weight than general language.'"   (quoting   Restatement (Second) of Contracts § 203(c) (1981))).

## CONCLUSION

For the foregoing reasons, we respectfully request that the Court grant TPS's motion for judgment on the pleadings, and enter a declaration: (1) that pursuant to the Indenture, the Trustee is required to accept the terms of the TPS offer and (2) that neither the Indenture nor any other law prohibits the payment of the consent payments to be paid directly to the preferred shareholders.  TPS also respectfully requests that the Court grant TPS's motion to dismiss the first, second, third, fourth, fifth, sixth and seventh cross- and counter-claims in the BAS Answer and the first, second, third, and fourth cross- and counter-claims in the Hildene Answer and all similar cross- and counter-claims in the other noteholder Answers.

DATED:      New York, New York
              April 13, 2010

                            SUSMAN GODFREY L.L.P.

                        By: /s/ Jacob W. Buchdahl
                            Jacob W. Buchdahl
                            Arun S. Subramanian
                            Seth D. Ard
                            654 Madison Avenue
                            New York, New York  10065
                            (212) 336-8330

                            *Attorneys for Interpleader-Defendant*
                             *Trust Preferred Solutions, LLC*

## Appendix

## Relevant Indenture Provisions

Section 1.1:  Definitions

"Offer":  With respect to any security, (a) any offer by the issuer of such security or by any other person made to all of the holders of such class of security to purchase or otherwise acquire all such securities (other than pursuant to any redemption in accordance with the terms of the related Underlying Instruments) or to exchange such securities for any other security or other property or (b) any solicitation by the issuer of such security or any other Person to amend, modify or waive any provision of such security or any related Underlying Instrument.

Section 6.1:  Certain Duties and Responsibilities

(a) Except during the continuance of an Event of Default (other than a Trustee Payment-Related Event of Default): (1) the Trustee undertakes to perform such duties and only such duties as are specifically set forth in this Indenture, and no implied covenants or obligations shall be read into this Indenture against the Trustee;

Section 7.8:  Negative Covenants

(a) The Issuer will not:  (1) sell, transfer, exchange or otherwise dispose of, or pledge, mortgage, hypothecate or otherwise encumber (or permit such to occur or suffer such to exist), any part of the Trust Estate, except as expressly permitted by this Indenture;

(c) The Trustee shall not sell, transfer, exchange or otherwise dispose of, or enter into or engage in any business with respect to, any part of the Trust Estate, except as expressly permitted by this Indenture.

Section 10.3:  Custody and Release of Portfolio Collateral

(d) The Trustee on behalf of the Issuer shall notify the Holders of the Preferred Shares of any Portfolio Collateral that is subject to an Offer. If no Event of Default has occurred and is continuing and subject to the provisions of Article XII hereof, the Holders representing at least 66-2/3% of the Preferred Shares may direct the Trustee to release from the lien of this Indenture such Portfolio Collateral in accordance with the terms of the Offer in each case against receipt of payment therefore.

Section 12.2:  Sale of Portfolio Collateral Subject to Offer or Call

Holders representing at least 66-2/3% of the Preferred Shares may direct the Trustee to sell an item of Portfolio Collateral that is the subject of an Offer or call for redemption, if, together with its direction to sell such security, such Holders certify to the Trustee that the sales price for such Security is equal to or greater than the price available pursuant to such Offer or call and such sale will be treated as if the Offer or call were consummated for purposes of determining the Collections for the Due Period relating to the date on which such sale occurs.